UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

  v.                                                                Case No. 10-CR-273

STEVEN J. NIGG,

        Defendant.

**ARMED CAREER CRIMINAL DETERMINATION AND
REQUEST FOR SUPPLEMENTAL BRIEFING**

On December 14, 2010, a Grand Jury sitting in Milwaukee returned an indictment charging Defendant Steven J. Nigg with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1), as an Armed Career Criminal (ACC). A person is an ACC if he has three previous convictions for a violent felony or a serious drug offense. 18 U.S.C. § 924(e)(1). Simple possession of a firearm by a felon is punishable by a term of imprisonment not to exceed ten years. 18 U.S.C. § 924(2). If convicted as an ACC, however, Nigg would be subject to a mandatory minimum sentence of fifteen years in prison and a maximum of life. 18 U.S.C. § 924(e).

On January 19, 2011, Nigg pled guilty to the charge of possession of a firearm by a felon, but reserved his right to challenge the government's assertion that he was subject to the ACC provisions of § 924(e). A Pre-Sentence Investigation Report (PSIR) was ordered, and sentencing was set for April 19, 2011. According to the PSIR, Nigg was convicted of three separate counts of armed robbery in Maricopa County, Arizona, on March 9, 1977. (PSIR ¶¶ 35-36.) The robberies occurred at a motel, a convenience store and a gas station over a five-day crime spree in early

November 1976 when Nigg was 21 years old. On November 3, Nigg and Dennis Oberheim robbed a motel clerk at gunpoint of $372.75. The following day, they took $100 from a male and female clerk of a convenience store at gunpoint, and on November 8, they took $197.72 in cash, and a pair of gloves and a pack of Kool cigarettes from a gas station. Nigg received concurrent 15 to 30 years terms on each armed robbery count, and other charges were dismissed as part of a plea agreement. On the basis of this record, it appears clear that Nigg is an ACC within the meaning of 18 U.S.C. § 924(e).

At the sentencing hearing, however, counsel for Nigg asked for an opportunity to brief the issue of whether Nigg qualified as an ACC. Counsel stated that he had come upon some authority that would support treating Nigg's three prior armed robberies as one offense, or at least less than three, given the fact they were all committed within a short period of time and he received the same concurrent sentence on each count. The Court granted Nigg's request and set a date for counsel to file his brief and the Government to respond. Having now had the opportunity to review Nigg's brief and the Government's response, the Court is satisfied that Nigg qualifies as an ACC under 18 U.S.C. § 924(e). Nigg's arguments to the contrary are easily refuted by the Government in its thorough response.

Nigg argues that the Court is unable to make a determination that his three previous armed robbery convictions constitute three previous convictions for a "violent felony" without violating his Sixth Amendment right to a jury determination of any factual dispute that mandates an enhanced penalty. *See United States v. Booker*, 543 U.S. 220, 231-33 (2005). Although the fact of a prior conviction used to enhance a sentence need not be submitted to a jury, *Booker*, 543 U.S. at 244, Nigg argues that to find that his three prior convictions for armed robber constitute three previous

convictions for a "violent felony" within the meaning of the ACC Act, "the Court would need to conduct fact finding on matters that are not solely related to the existence or non-existence of a conviction." (Def.'s Br. at 3.) Because doing so would violate his Sixth Amendment right to a jury trial under *Booker*, Nigg argues that he must be sentenced without the ACC enhancement.

As noted above, the ACC Act imposes a fifteen-year minimum sentence on an offender who has three previous convictions "for a violent felony or serious drug offense, or both, committed on occasions different from one another." 18 U.S.C. § 924(e). The Act defines the term "violent felony" as:

> any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or carrying of a firearm, knife, or destructive device that would be punishable by imprisonment for such term if committed by an adult, that–
>
> > (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
> >
> > (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another . . .

18 U.S.C. § 924(e)(2)(B). The definitions of "violent felony" under the ACC Act and "crime of violence" as used in the United States Sentencing Guidelines are similar and the analysis is essentially identical. *United States v. Woods*, 576 F.3d 400, 404 (7th Cir. 2009).

In determining whether a crime is a violent felony, the court is to "consider the offense generically, that is to say, . . . examine it in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Begay v. United States*, 553 U.S. 137, 141 (2008). Under this categorical approach the court first identifies the offense involved and then focuses on "the particular elements of the statutory offense, without

consideration of the underlying facts of the individual case." *United States v. Fife*, 624 F.3d 445 (7th Cir. 2010). If upon consideration of the statutory elements it appears that certain modes of committing the crime would constitute violent felonies within the meaning of the ACC Act, whereas others would not, it then becomes necessary to determine precisely which offense is involved within that statutory scheme. The court in that event employs a "modified categorical approach" to determine the statutory offense at issue. *Id.*; *United States v. McDonald*, 592 F.3d 808, 810-11 (7th Cir. 2010). The modified categorical approach allows consideration of a limited range of outside documents to isolate the specific statutory offense which formed the basis for the conviction. Documents which may be consulted under this approach include the charging document, the plea agreement or the transcript of the colloquy between the judge and the defendant in which the factual basis for the plea was confirmed by the defendant, or comparable judicial records of such information. *Fife*, 624 F.3d at 445 (citing *Shepard v. United States*, 544 U.S. 13, 26 (2005)).

The Arizona law under which Nigg was convicted defines robbery as the "felonious taking of personal property in the possession of another from his person, or immediate presence, and against his will, accomplished by means of force or fear." A.R.S. § 13-641.[1] The "fear" by which the crime can be accomplished is either "the fear of unlawful injury to the person or property of the person robbed, or of a relative or member of his family" or "the fear of an immediate and unlawful injury to the person or property of one in the company of the person robbed at the time of the robbery." A.R.S. § 13-642. If "committed by a person armed with a gun" a minimum sentence of

---

[1] Copies of the applicable Arizona statutes are attached to the Government's brief as Exhibit 2.

4

five to twenty years is mandated depending on whether it was a first, second or subsequent offense. A.R.S. § 643(B). The criminal complaint and judgments for each charge indicate that all three of Nigg's convictions were for armed robbery with a gun.[2]

Each of Nigg's armed robbery convictions constitutes a violent felony within the meaning of the ACC Act. The elements of the offense of armed robbery, as defined under Arizona law, included (1) taking property from the person or presence of another (2) against his will (3) by means of force or fear (4) while armed with a gun or other dangerous weapon. Under the pure categorical approach it is perhaps arguable that the fact that Arizona allows conviction for robbery even when the fear used to accomplish the taking is "fear of unlawful injury to property" takes it out of the force/threat test in clause (i). To meet the definition of a violent felony under the force/threat clause, the crime must have as an element "the use, attempted use, or threatened use of physical force against the person of another." If Nigg accomplished the robbery by use of fear of injury to the property of the victim, as opposed to fear of injury to his person, it arguably would not meet the definition in clause (i). But it would still meet the residual test under clause (ii).

A previous felony conviction is also considered a violent felony if it "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another." 18 U.S.C. § 924(e)(2)(B)(ii). Armed robbery is not one of the enumerated crimes, so to count as a serious felony it must fall within the residual clause. Prior to the Supreme Court's decision in *Begay*, the Seventh Circuit "analyzed the residual clause by asking only whether the crime in question typically encompasses conduct creating a risk of injury similar

---

[2] Certified copies of the criminal complaints and judgments are attached to the Government's brief as Exhibit 1.

5

to the enumerated crimes." *United States v. Capler*, 636 F.3d 321, *2 (7th Cir. 2011) (citing *United States v. Mathews*, 453 F.3d 830, 836–37 (7th Cir.2006); *United States v. Franklin*, 302 F.3d 722, 723 (7th Cir.2002)). In *Begay*, however, the Supreme Court "added a second level of analysis, a similar-in-kind inquiry, which asks whether the crime as ordinarily committed reflects the same 'purposeful, violent, and aggressive' conduct as the listed crimes." *Id.* (quoting *Begay*, 553 U.S. at 144–45). Thus, under current law, a crime is considered a violent felony under the residual clause if the crime "would, in the ordinary or typical case, present a serious risk of physical injury as a result of purposeful, violent, or aggressive conduct similar in kind and risk to the crimes enumerated in [18 U.S.C. § 924(e)(2)(B)(ii)]." *United States v. Sonnenburg*, 628 F.3d 361, 364 (7th Cir. 2010).

Armed robbery, even if accomplished by fear of injury to property of the victim, would meet this definition. It is clearly a crime that in the ordinary or typical case presents a serious risk of physical injury as a result of purposeful, violent, or aggressive conduct similar in kind and risk to the enumerated crimes. In the pre-*Begay* case of *United States v. Howze*, the Seventh Circuit held that the crime of robbery under Minnesota law, defined so as to include theft from person, constituted a violent felony under the residual clause because of its similarity to the enumerated crime of burglary: "What theft from a person has in common with generic burglary is that both entail a risk that violence will erupt between the thief and the victim." 343 F.3d 919, 923 (7th Cir. 2003). Nothing in *Begay* undermines *Howze*'s holding. And more recently, the Seventh Circuit concluded post-*Begay* that Wisconsin's vehicular-fleeing offense qualified as a violent felony under the ACC Act's residual clause. If these offenses constitute violent felonies as defined by the ACC Act, then surely Nigg's armed robbery convictions would as well, no matter how he may have

6

committed it.

Nigg also argues that it is unclear whether his armed robbery convictions should be treated as three separate violent felonies, as opposed to one or two. Because the record shows that he was convicted as an accomplice to Dennis Oberheim, whom Nigg characterizes as "the leader of these criminal escapades," it is unclear what his precise role in the commission of the armed robberies might have been. It is possible, Nigg argues, that his participation did not involve three separate and distinct acts. (Def.'s Br. at 5.) In support of his argument, Nigg cites *United States v. Fuller*, in which the defendant argued that two of his previous burglary convictions did not qualify as two separate violent felonies committed on "occasions different from one another" because he and an accomplice had gone into two separate trailers simultaneously. 453 F.3d 274, 278 (5th Cir. 2006). Based on the indictments, the Fifth Circuit concluded that it was not possible to determine whether the burglaries had occurred on separate occasions and vacated the district court's determination that the defendants was an ACC. *Id.* at 279-80. Nigg argues that the same reasoning applies here.

As the Government points out, however, the judgments of convictions in this case make no mention of whether Nigg's conviction was as an aider and abetter. Arizona' accomplice liability statute is referenced in the complaint but there are no facts alleged that would suggest Nigg was not directly liable. Since it is clear under the categorical approach that the convictions were for violent felonies, the Court has no need or authority to consult the complaints or other documentation. Thus, as far as the relevant portion of the record is concerned, Nigg directly committed each of the armed robberies.

Even if the Court were to consider the complaints and assume that Nigg's convictions were for aiding and abetting, however, the result would be the same. It is clear from the complaints that

7

Nigg's three armed robbery convictions were for three separate crimes that occurred on three different dates in three different locations to three different victims. Moreover, Arizona law abolished the distinction between accomplices before the fact and principals, and treats all persons concerned in the commission of the crime as principals. A.R.S. §§ 13-138, 13-138. Nothing in *Fuller* would support Nigg's argument that one or more of his armed robberies were committed on the same occasion. His argument finds even less support in Seventh Circuit case law. *See, e.g., United States v. Hudspeth*, 42 F.3d 1015, (7th Cir. 1994) (holding that defendant who with two others broke into three separate businesses located in a strip mall within thirty-five minutes committed three separate violent felonies within the meaning of the ACC Act). Accordingly, the Court agrees with the Government that Nigg falls within the definition of an ACC, and he is subject to the Act's fifteen-year mandatory minimum sentence.

A more fundamental question necessarily arises with this determination, however, and the Court has decided to request the Government to address it in a supplemental brief. Specifically, the Court hereby requests that the Government explain why the sentence it is requesting in this case is just. The question of whether the sentence sought by the Government is just arises because the predicate offenses for Nigg's ACC designation are almost thirty-five years old, he appears to have led a substantially crime-free and, in some respects, exemplary life since he was released from prison in 1990, and the offense of conviction appears to lack any of the aggravating factors that would normally justify such a lengthy sentence.

The crime for which Nigg is awaiting sentencing, possession of a firearm by a person who has previously been convicted of a felony, is a serious offense simply by virtue of the fact that Congress makes such possession punishable by up to ten years in prison even absent the ACC

8

enhancement. But possession of a firearm is not wrong in itself, or to use the more traditional terminology, it is not *malum in se*.[3] Firearms are useful tools that since their invention have played an important role in the defense of citizens and the country, and in providing food and sport to individuals and their families. Simply possessing such a tool is not by itself morally wrong. Nigg's possession of firearms was instead *malum prohibitum*, wrong because it was prohibited by law. As a person previously convicted of a serious crime, Nigg was prohibited by law from possessing a firearm. Nigg was without question aware of the prohibition he was under and is thus fully culpable. But his culpability, as far as the record shows, is for violating the law prohibiting him from possessing a firearm and not for a separate and intrinsically wrongful act.

Additionally, the circumstances surrounding Nigg's possession of firearms and his arrest suggest his offense was not part of a plan to commit a more serious crime. According to the PSIR, the guns Nigg was convicted of possessing belonged to his late father, who had served in the Marines and ran several businesses in northern Wisconsin. When his father died in 2009, Nigg was named the executor of the estate which included a collection of over 120 firearms. (PSIR ¶ 58.) Nigg's step-mother, Joyce, suspected Nigg of selling some of the firearms in violation of the probate court's restraining order and, through her attorney, hired a private investigator to attempt to purchase firearms from Nigg at a consignment shop Nigg ran out of his home in Lakewood, Wisconsin. On September 4, 2010, the private detective purchased two firearms from Nigg at his

---

[3] An act is said to be *malum in se* when it is inherently and essentially evil, that is, immoral in its nature and injurious in its consequences, without any regard to the fact of its being noticed or punished by the law of the state." *Black's Law Dictionary* 959 (6th ed. 1990). In comparison, *malum prohibitum* means "a thing which is wrong because [it is] prohibited; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law." *Id.* at 960.

9

shop: an "Ed Kettner, 35 Whelan caliber bolt action rifle, marked with 'Coln Suhl' but bearing no serial number, and a Kimber, model 82, 22 caliber rifle, bearing serial number JFFH1984." (PSIR ¶ 16.) Nigg also showed the investigator a printed list of some of the firearms from his father's estate. Notations on the list were intended to indicate which had been shipped to an auction house in Maine and which had been sold. In a deposition taken in the civil action his step-mother commenced against his father's estate, Nigg testified that in his capacity as executor of the estate, he had decided to liquidate some of his father's guns and divide the proceeds among the named beneficiaries. Since he is a felon, Nigg said he asked his brother to transfer several of their father's guns to an auction house in Maine and to a Wisconsin buyer. Nigg testified he had about seven guns "stashed" at a friend's house but would not say where.

Nigg was charged after Joyce's attorney and the private detective she hired met with a special agent from the Bureau of Alcohol, Tobacco and Firearms and turned over the results of their investigation. He was arrested on a warrant issued upon a complaint filed by the United States Attorney and has been detained since his initial appearance on December 1, 2010. Having now pled guilty to possession of a firearm by a felon, Nigg is clearly deserving of some punishment, but the question that concerns the court is whether the minimum fifteen-years mandated by the ACC statute is a just sentence for his crime.

Nigg is now fifty-five years and, according to the PSIR, had two misdemeanor convictions since his release from prison in 1990, both resulting in a fine. Given the age of his earlier, more serious convictions, they do not score under the Guidelines. But for the ACC enhancement, he would be in Criminal History Category I, and the sentence range under the Guidelines would be 12 to 18 months. (PSIR ¶ 80.) The mandatory minimum sentence the Court must impose if Nigg is

an ACC is fifteen times the low end of the otherwise applicable sentence range. If Nigg had just recently completed his prison sentence, a fifteen-year sentence for possession of a firearm by a felon might seem reasonable. But it appears he's been out of prison and has avoided serious crime for twenty years. This is quite a change from his early years.

Nigg was born in Blue Island, Illinois, and after his parents' divorce when he was 7 years old, lived with his mother and spent weekends with his father. At age 12, Nigg began living with his father, who had remarried. He remained close to both parents and his father's second wife, Marge, who died in 1992, as well as his four siblings and two step-siblings. According to his brother, the family lived with the mother in the projects in Chicago and lived on welfare. Nigg dropped out of school and got into some trouble as a juvenile before he committed the armed robberies in Arizona. (PSIR ¶¶ 48, 49, 51, 55, and 56.) After his release from prison, however, he moved to Wisconsin to care for Marge when she became sick with cancer and continued to live with his father after Marge's death until his father remarried yet again, this time to Joyce. (PSIR ¶¶ 54, 56, and 62.)

Over the past twenty years, it appears that Nigg has been a contributing member of the community in northeastern Wisconsin where he now lives. The Court has received numerous letters of support testifying to Nigg's kind and generous character, his willingness to help neighbors, and his involvement in community activities, notably martial arts classes for youth and annual appearances as a volunteer Santa Claus and Easter Bunny. It is in light of this more recent history, and given the age of the violent felonies and the circumstances surrounding the offense of conviction, that the Court requests that the Government explain why the sentence it requests in this case is just.

11

The Court's request is based on two underlying assumptions that should be made explicit. The first assumption is that there can be a distinction between what the positive law commands and what is just, and the second assumption is that the Government is not asking the Court to impose a sentence it believes is unjust. The second assumption seems obvious on its face since it would be shocking if the United States Department of Justice, of which the United States Attorney is a part, were to ask a court to impose a sentence it knew to be unjust. Such a request would also be wholly inconsistent with the history of the particular Assistant United States Attorney handling the case who has appeared in this Court many times in the past. The first assumption merits some discussion, however, since it involves the consideration of issues that many of us who are immersed in the practice of law can, even with the best of intentions, lose sight of.

While today some may deny such a distinction, our country's founding rests upon the recognition that the laws of the sovereign can be unjust, either on their face or as applied. That was after all the premise underlying the decision of the original thirteen colonies to rebel from England as explained in the Declaration of Independence. But one need not go back to the country's founding to find evidence supporting the distinction. Anyone familiar with the history of the world over the last century, or even this country's history over the last fifty years, understands that governments, even democratically elected governments, are capable of enacting laws that, either as written or applied, produce unjust results. To say that the law commands a particular sentence is therefore not the same as saying that the sentence is just.

The primary purpose of a sentence is "to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). A basic precept of justice is that punishment for crime be proportionate to the offense. *Weems v. United States*, 217 U.S. 349, 367 (1910); *see also Solem v. Helm*, 463 U.S.

12

277, 284 (1983) ("The principle that a punishment should be proportionate to the crime is deeply rooted and frequently repeated in common-law jurisprudence."). In layman's terms, the punishment should fit the crime; the criminal should receive no more than he deserves. This principle is essential to public confidence in our system of justice:

> The notion that punishment should be proportional to the seriousness of the offense is fundamental to maintaining an identity between the criminal law and the public's general sense of morality. In this way, proportionate sentencing serves the purpose of instilling respect for penal law. A penal system that imposes severe punishments for minor crimes runs the risk of being discredited and ridiculed.

Allyn G. Heald, *United States v. Gonzalez: In Search Of A Meaningful Proportionality Principle*, 58 Brooklyn L. Rev. 455, 472 (1992); *see also* Karen Lutjen, Note, *Culpability and Sentencing Under Mandatory Minimums and the Federal Sentencing Guidelines: The Punishment No Longer Fits the Criminal*, 10 Notre Dame J.L. Ethics & Pub. Pol'y 389, 389 (1996) ("If [the proportional] link between culpability and the punishment imposed is severed, then the foundations upon which the criminal justice system are based are rendered morally suspect.").

There are other purposes for a sentence, to be sure, including deterrence, protection of the public, and rehabilitation or treatment. 18 U.S.C. § 3553(a)(2)(B), (C), and (D). But these later purposes are more properly viewed as additional benefits that result from a just sentence. They are factors that a judge should consider in determining where, within the range of what might be considered just, a particular offender's sentence should fall. They are not overriding goals of a sentence that by themselves should be allowed to determine its length for the simple reason that they have no limiting principle linked to the crime for which the sentence is imposed.

The guiding principle of deterrence, for example, is the-more-the-better: if the primary purpose of a sentence is to deter the offender and others from committing the same crime, then the

13

harsher the sentence, the greater the deterrence. One frequently cited hypothetical used to illustrate the principle envisions a city enacting a law requiring life imprisonment for third-offense illegal parking in an effort to stem the tide of illegal parking. *See, e.g., Rummel v. Estelle*, 445 U.S. 263, 288 (1980) (Powell, J., dissenting). Such a law would clearly deter illegal parking, but would be horribly unjust. Only considerations of justice can provide a limit to the goal of deterrence. The same is true with protection of the public and rehabilitation or treatment. If public protection is taken as the driving force, then a life sentence may appear appropriate for an individual perceived as dangerous and likely to re-offend, no matter what the crime that brings him before the court. Of course, if we know a person is actually going to harm someone, it makes perfect sense to lock him up in order to prevent him from doing so. But what an individual will do in the future is by its very nature unknowable, and it is manifestly unjust to punish a person now for what others believe he will do in the future.[4] Likewise, if rehabilitation or treatment is the sole purpose for sentencing, then the only limiting factor is the length of time it will take to provide a "cure" no matter how long that may be. For what are deemed to be chronic conditions, the cure can take a lifetime. And only those who are experts in the field are qualified to opine on the nature and length of treatment required.[5]

In sum, as important as deterrence, protection of the public, and treatment/rehabilitation are to the sentencing determination, the primary goal of sentencing is to impose just punishment for the

---

[4] This is assuming that the person has control of his faculties and is not mentally ill. Absent severe mental illness, human beings are presumed free and capable of choosing whether or not to commit crimes.

[5] For an interesting essay on the effect of substituting treatment for just punishment as the purpose of criminal sentencing, see C. S. Lewis, *The Humanitarian Theory of Punishment*, 6 Res Judicate 224 (1953).

offense. Considerations of justice must provide the limit for the length of imprisonment to which one is sentenced for criminal conduct, and the key principle of justice in this context is proportionality: the sentence should be proportional to the severity of the offense and the culpability of the offender.

Proportionality, to be sure, is not an exact measure, and reasonable people can disagree on what punishment is just for a particular crime. As Judge Noonan observed in *United States v. Harris*, "[p]roportionality between crime and sentence is difficult to lay out abstractly. To achieve it is a matter of judgment-[in most cases] the judgment of the sentencing judge." 154 F.3d 1082, 1085 (9th Cir. 1998) (Noonan, J., concurring). It is because of the absence of clear standards, at least in part, that a majority of the Supreme Court has been reluctant to recognize a proportionality principle embodied in the Eighth Amendment prohibition of cruel and unusual punishment that would prohibit any but the most extreme cases of disproportionate sentences. *See, e.g., Ewing v. California*, 538 U.S. 11 (2003) (upholding sentence of twenty-five years to life for theft of three golf clubs under state's recidivist sentencing statute); *Lockyer v. Andrade*, 538 U.S. 63 (2003) (upholding sentence of fifty years to life for two shoplifting incidents involving nine videotapes under state's recidivist sentencing statute). But to say a sentence does not offend the constitution is not the same as saying it is just. The Constitution prohibits cruel and unusual punishment; it does not prohibit unjust sentences.

The fact that the determination of what is just is subject to dispute and cannot be made with mathematical precision is not a reason to eliminate it from consideration. As Judge Noonan also observed, "[t]o eliminate proportionality is to eliminate the virtue of prudence which should guide every act of judgment." *Harris*, 154 F.3d at 1085. Only a culture that has reduced human

15

knowledge to what can be quantified or is empirically verifiable would think otherwise. Such a culture would have eliminated justice as a consideration since justice itself cannot be quantified or empirically verified.

It is with these considerations in mind that the Court makes its request for supplemental briefing. The Government elected to charge Nigg as an ACC, and therefore must believe that a sentence of at least fifteen years is just. In requesting an explanation of its reasons, the Court is not seeking to intrude on prosecutorial discretion. Indeed, the Government may decline the Court's request for an explanation, and the Court would still be required by law to impose a fifteen-year sentence. But that is the point. Despite the fact that it is the prosecutor who elected to charge Nigg as an ACC, it is the Court that is required to impose the sentence. Because Nigg qualifies as an ACC, the Court is required by law to impose a sentence of at least fifteen years no matter what its own views may be. The prospect of imposing an unjust sentence raises serious moral concerns for the Court. Obviously excessive sentences also undermine public confidence in the courts and the law, engender bitterness and resentment in the accused and his family, and waste public funds and correctional resources.[6] Thus, even though the charging decision lies within the discretion of the prosecutor, it has serious ramifications for the courts and the public as a whole. By explaining why a fifteen year sentence in this case is just, the Government will assure both the Court and the public that these important interests have been taken into consideration. On the other hand, if the Government upon consideration of the entire record and the additional information disclosed in the PSIR now concludes that a fifteen-year sentence is too severe, it is free to seek an alternative

---

[6] According to the most recent advisory from the Administrative Office of the U.S. Courts, the monthly cost of imprisonment in federal prison is $2,270.93, resulting in an annual cost of $27,251.16. (PSIR ¶ 76.)

disposition.

Accordingly, the Court requests that the Government file its supplemental brief explaining why a fifteen-year sentence in this case is just on or before May 16. 2011. The Clerk is directed to set this matter on the Court's calendar after that time for pronouncement of sentence or, if the Government elects to seek a different disposition, further proceedings.

Dated this 5th day of May, 2011.

                                          s/ William C. Griesbach
                                          William C. Griesbach
                                          United States District Judge